**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

---

## Case No. 22-1054

---

UNITED STATES EX REL. JOHN DOE,
Plaintiff-Appellant,

v.

CREDIT SUISSE AG
Defendant-Appellee

UNITED STATES OF AMERICA
Party-in-Interest-Appellee

---

On appeal from the
United States District Court
for the Eastern District of Virginia

---

**PLAINTIFF-APPELLANT'S REPLY BRIEF**

**MARCUS NEIMAN RASHBAUM & PINEIRO LLP**
One Biscayne Tower, 2 S. Biscayne Blvd., Ste. 2530
Miami, Florida 33131
Telephone: (305) 400-4260
Jeffrey A. Neiman, Esq.
Jeffrey E, Marcus, Esq.
Brandon S. Floch, Esq.

Counsel for the Appellant, John Doe

# **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................1

ADDITIONAL BACKGROUND FACTS .................................................2

ARGUMENT ........................................................................................9

   I.   The District Court Violated the FCA By Not Holding an In-Person Hearing.............................................................................................9

      a.   The FCA requires an in-person hearing....................................9

      b.   In-person hearings are, at the very least, required when a relator shows that the Government's dismissal is motivated by illegitimate reasons. .........12

   II.   Plaintiff Stated a Cognizable FCA Claim. .................................17

      a.   The False Claims Act .............................................................17

      b.   Fraud-in-the-Inducement Theory ...........................................18

      c.   Reverse False Claims Theory..................................................19

      d.   Public policy supports finding a cognizable FCA claim. .......23

   III.  Credit Suisse's Alternative Arguments for Dismissal Should Be Rejected. ..............................................................................................25

CONCLUSION ..................................................................................26

i

## TABLE OF AUTHORITIES

*Cook Cty. v. United States ex rel. Chandler*,
  538 U.S. 119 (2003) -------------------------------------------------------------- 17

*Eriline Co. S.A. v. Johnson*,
  440 F.3d 648 (4th Cir. 2006) ------------------------------------------------- 25

*Goldberg v. Kelly*,
  397 U.S. 254 (1970) -------------------------------------------------------------- 10

*Harrison v. Westinghouse Savannah River Co.*,
  176 F.3d 776 (4th Cir. 1999) ------------------------------------------------- 17

*Heckler v. Chaney*,
  470 U.S. 821 (1985) -------------------------------------------------------------- 13

*Holly Hill Farm Corp. v. United States*,
  447 F.3d 258 (4th Cir. 2006) ------------------------------------------------- 25

*Ridenour v. Kaiser-Hill Co.*,
  397 F.3d 925 (10th Cir. 2005)------------------------------------------------- 15

*Ruscher v. Omnicare Inc.*,
  2014 WL 4388726 (S.D. Tex. Sept. 5, 2014) ------------------------------21, 22, 23

*United States v. Gonzalez*,
  520 U.S. 1 (1997) ------------------------------------------------------------------ 17

*Tulsa Prof'l Collection Servs. v. Pope*,
  485 U.S. 478 (1998) -------------------------------------------------------------- 10

*U.S. ex rel. Boise v. Cephalon, Inc.*,
  2015 WL 4461793 (E.D. Pa. July 21, 2015) -----------------------------------21

*United States ex rel. CIMZNHCA, LLC v. UCB, Inc.*,
  970 F.3d 835 (7th Cir. 2020).------------------------------------------------- 14, 15

*United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*,
  839 F.3d 242 (3d Cir. 2016) ----------------------------------------------------21

*United States ex rel. Health Choice Alliance v. Eli Lily & Co.*,
  4 F.4th 255 (5th Cir. 2021) ------------------------------------------------------ 11

ii

*United States ex rel. Longhi v. Lithium Power*,

   575 F.3d 458 (5th Cir. 2009).--------------------------------------------------18

*United States ex rel. Polansky*,

   599 U.S. 419 (2023) ---------------------------------------------- 9, 13, 14

*United States ex rel. Siller v. Becton Dickinson & Co.*,

   21 F.3d 1339 (4th Cir. 1994) ----------------------------------------------11

*United States ex rel. Stovall v. Webster*,

   2018 WL 8701241 (D.S.C. May 30, 2018)--------------------------------------16

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*,

   525 F.3d 370 (4th Cir. 2008) ----------------------------------------------18

*United States of America v. Fields*,

   763 F.3d 443 (6th Cir. 2014) ----------------------------------------------19

*United States v. Academy Mortg. Corp.*,

   2018 WL 1947760 (N.D. Cal. Apr. 25, 2018)--------------------------------15

*United States v. BNP Paribas SA*,

   884 F. Supp. 2d 589 (S.D. Tex. 2012)--------------------------------------26

*United States v. Mikalajunas*,

   186 F.3d 490 (4th Cir. 1999) ----------------------------------------------24

*Vermont Agency of Natural Resources v. United States ex rel. Stevens*,

   529 U.S. 765 (2000) ------------------------------------------------------10

# INTRODUCTION

In 2014, Credit Suisse pled guilty to assisting wealthy Americans to conceal billions of dollars from the United States. At the time it pled guilty, Credit Suisse lied to and withheld information from the court that accepted its plea agreement, causing the United States to forfeit approximately $1.3 billion owed to it in the form of criminal fines. Since pleading guilty, Credit Suisse breached its plea agreement obligations by engaging in an ongoing criminal tax conspiracy for nearly a decade after it swore, under oath, it was turning a new leaf. The continuing conspiracy to defraud the United States, which has since been confirmed by the United States Senate Finance Committee, only came to light after additional whistleblowers, former Credit Suisse bankers, came forward.

The Relator, a former Credit Suisse banker, urged the United States to hold Credit Suisse accountable through this False Claims Act ("FCA") suit. The Government refused—likely because pursuing this FCA case would bring to light DOJ's inadequate investigation into Credit Suisse and its failure to stop Credit Suisse for nearly a decade from engaging in the very conspiracy it pled guilty to. While Credit Suisse's recently released financials[1] allude to an ongoing DOJ criminal

---

[1] UBS Group Third Quarter 2023 Report at 100 available at  https://www.ubs.com/global/en/investor-relations/financial-information/quarterly-reporting/qr-shared/2023/3q23/_jcr_content/mainpar/toplevelgrid_copy_co/col1/linklistreimagined_c/link.0942839187.file/PS9jb250ZW50L2RhbS9hc3NldHMvY2MvaW52ZXN0b3ItcmVsYXRpb25zL3F1YXJ0ZXJseS1yZXBvcnRpbmcvM3EyMy9mdWxsLXJlcG9ydC11YnMtZ3JvdXAtYWctY29uc29saWRhdGVkLTNxMjMucGRm/full-report-ubs-group-ag-consolidated-3q23.pdf

1

investigation focusing on the facts at the center of this lawsuit, to date, Credit Suisse has not been held accountable for having lied to the district court, the United States Senate, the IRS, and DOJ, and for continuing to defraud the United States. Through this lawsuit, the Relator seeks to hold Credit Suisse accountable and collect the monies Credit Suisse owes to the United States.

The Relator respectfully requests that this case be remanded for the district court to hold a hearing and determine, in the first instance, whether the Relator should be allowed to pursue this action—perhaps the only vehicle to hold Credit Suisse accountable—over the Government's dismissal.

## **ADDITIONAL BACKGROUND FACTS**

The opening brief summarizes in detail the facts that gave rise to this action. Relator provides additional information here regarding the lies Credit Suisse unleashed to induce the district court to accept a plea deal that gave Credit Suisse an over $1.3 billion discount on its criminal fine.

### *In February 2014, Credit Suisse Lies to the United States Senate*

Around the time that Credit Suisse was engaged in plea negotiations with DOJ, in early 2014, Credit Suisse executives including then-Chief Executive Officer Brady Dougan and General Counsel Romeo Cerutti testified under oath before the Senate Permanent Subcommittee on Investigations. *See Offshore Tax Evasion: The Effort to Collect Unpaid Taxes on Billions in Hidden Offshore Accounts*, S. Hrg.

113-397 (Feb. 26, 2014). Credit Suisse executives' sworn testimony provides greater context for the representations contained in Credit Suisse's plea agreement and statement of facts which was executed three months later.

At that Senate hearing, Mr. Dougan testified under oath that from 2009 through 2014, Credit Suisse had hired many professionals "to help check whether clients who might have a possible U.S. connection were identified. If they had any U.S. connection, they were required to demonstrate their compliance with U.S. tax law if they wanted to remain clients of our Bank." *Id.* at 12.

In addition, Mr. Dougan testified under oath that by 2013 Credit Suisse "had identified the complete population of potential U.S. account relationships to an extremely high level of confidence" and that Credit Suisse had "proactively taken steps to require that only those U.S. clients who established compliance with U.S. tax laws can be clients of our Bank."[2] *Id.*

Mr. Dougan further testified under oath that "the combination of the steps we have taken, with the waiver, with the full implementation of the projects that we have laid out, with FATCA, will allow us to be 100 percent compliant with those requirements around the U.S. taxpayer." *Id.* at 34.

Moreover, Mr. Dougan testified under oath that Credit Suisse had performed

---

[2] Hans-Ulrich Meister, Credit Suisse's then co-head of Private Banking and Wealth Management Division, also testified under oath that from 2009 through 2014 Credit Suisse had "check[ed] that only U.S. clients who can demonstrate that they have established compliance with U.S. tax laws can be clients of Credit Suisse." S. Hrg. 113-397 at p. 15.

"a very extensive investigation across the whole Bank, including all of those, as you mentioned, 1,800, all of these other [Relationship Managers] and we did not find any of the misbehavior, again, which we agree with you is egregious and should not have happened." *Id.* at 37.

And finally, to assure the Senate Permanent Subcommittee on Investigations, Mr. Dougan testified that Credit Suisse was "going to be completely compliant going forward." *Id.* at 44.

Those statements were false and similar false statements were rehashed in the statement of facts and incorporated into Credit Suisse's plea agreement.

### *In May 2014, Credit Suisse Lies to Judge Rebecca Beach Smith*

On May 19, 2014, Alan Reifenberg, the global head of litigation and investigations for Credit Suisse and its authorized representative, stood before District Court Judge Rebecca Beach Smith to plead guilty on behalf of Credit Suisse. *United States v. Credit Suisse*, 1:14-cr-188 (E.D. Va.), D.E. 17. Judge Smith placed Mr. Reifenberg under oath and advised him that once he was "placed under oath, **all of your answers have to be full and complete and truthful**. If they're not, you yourself and/or Credit Suisse can be subjected to a further prosecution for perjury or making a false statement to the Court." *Id.* at 6 (emphasis added). Judge Smith then questioned Mr. Reifenberg and Mr. Christopher Wray, Credit Suisse's outside counsel, about the statement of facts incorporated into the plea agreement. Mr.

4

Reifenberg swore that the statement of facts was full, complete and truthful:

> The COURT: All right. Mr. Reifenberg and Mr. Wray, you need to come back to the podium. All right. Mr. Reifenberg, you signed this agreed statement of facts, and you are under oath. I would ask you: Are these facts true?
>
> Mr. Reifenberg: They are, your Honor …
>
> The Court: All right. I would direct that the agreed statement of facts be filed subject to acceptance of the guilty plea.

*Id.* at 35.

Mr. Reifenberg lied to the Court. The statement of facts, as shown below, was riddled with material lies. Contrary to the statement of facts, Credit Suisse's conspiracy did not end in 2009 but continued through the date of the plea agreement and even through earlier this year.

### Credit Suisse's May 2014 Statement of Facts Rests on a Mountain of Lies

In the statement of facts, Credit Suisse several times represented that it had, in the past, operated an illegal U.S. cross-border business for "decades prior to and through in or about 2009."[3] That was false.

Credit Suisse's criminal conspiracy did not end in 2009. It did not end in 2010

---

[3] *See* JA 79 ("For decades prior to and through in or about 2009, in the Eastern District of Virginia and elsewhere, CREDIT SUISSE did unlawfully, voluntarily, intentionally, and knowingly conspire, combine confederate, and agree together with others to commit the following offense against the United States: to willfully aid … the preparation and presentation of false income tax returns"); JA 79 ("For decades prior to and through in or about 2009, CREDIT SUISSE operated an illegal cross-border banking business that knowingly and willfully aided and assisted thousands of U.S. clients in opening and maintaining undeclared accounts and concealing their offshore assets and income from the IRS.").

when DOJ began its criminal investigation. And it did not end when Credit Suisse executed the plea agreement and statement of facts. Indeed, at the time of sentencing in 2014 Credit Suisse continued its illegal U.S. cross-border business and continued to assist U.S. taxpayers—like Dan Horsky—to evade their U.S. tax obligations.

In the statement of facts, Credit Suisse represented that it had stopped opening new U.S. client accounts for U.S. residents and required existing clients to become U.S. tax compliant.[4] That was false too. Credit Suisse represented that by 2010 it "had either transferred or terminated the majority of its relationships with U.S. clients" and that it "continued to identify U.S. customer accounts for closure until in or about 2013, including dormant and recalcitrant accounts with illiquid assets." JA 90. Again, false.

Shortly after the Credit Suisse sentencing in 2014, DOJ indicted Mr. Horsky, an American citizen who hid his funds offshore with Credit Suisse's assistance. Based on information Relator provided to DOJ, Mr. Horsky pled guilty to conspiring with Credit Suisse to defraud the United States from 2000 through 2015. JA 100-101. Mr. Horsky's plea agreement established that at the time of Credit Suisse's guilty plea, Credit Suisse had not ended its criminal conspiracy; Credit Suisse

---

[4] *See* JA 89 ("[I]n or about late 2008, CREDIT SUISSE's management decided to terminate accounts of U.S. domiciliary companies with U.S. beneficial owners who could not establish tax compliance. In or about Spring 2009, CREDIT SUISSE stopped opening new U.S. client accounts for U.S. residents and … if they were not already tax compliant, become tax compliant, or leave the bank.").

certainly had not ended its illegal U.S. cross-border business in 2009 as set forth in the statement of facts; statements made in the statements of fact were false; and statements made under oath by Credit Suisse executives were false.

At the time it was sentenced in 2014, Credit Suisse had not closed Mr. Horsky's $200 million account; it had not identified Mr. Horsky's account to DOJ; and it had not taken actions to require Mr. Horsky to become tax compliant. A recent Senate Finance Committee report confirms that, along with Mr. Horsky's account, Credit Suisse continued to illegally manage large accounts for at least 23 other U.S. persons through 2023. *See Credit Suisse's Role in U.S. Tax Evasion Schemes* at 2 (the "Senate Report").[5] In short, Credit Suisse lied to Judge Smith; the statement of facts bore little resemblance to the truth.

Thus, contrary to its plea agreement, as of 2014: (1) Credit Suisse was still engaged in an ongoing criminal conspiracy to defraud the United States; (2) Credit Suisse had not ended its illegal U.S. cross-border business in 2009; and (3) Credit Suisse had not required all existing clients to become U.S. tax compliant.

Based on these fundamental lies, Judge Smith accepted a plea agreement and sentenced Credit Suisse to pay a penalty at the low end of the criminal guideline range—about $1.3 billion rather than the $2.6 billion it could have levied on Credit

---

[5] Available at
https://www.finance.senate.gov/imo/media/doc/SFC%20CREDIT%20SUISSE%20REPORT%20FINAL%20Mar%2028.pdf

Suisse. JA 117.

***The Senate Finds that Credit Suisse Lied in 2014***

Credit Suisse's lies in its statement of facts were further corroborated by a March 29, 2023 Senate Report. For example, the Senate Finance Committee concluded that Credit Suisse "fail[ed] to report what may be an ongoing criminal tax conspiracy" and that the "Committee also obtained voluminous records detailing the role Credit Suisse employees played in assisting U.S. businessman Dan Horsky in concealing over $220 million in offshore accounts from the IRS." Report at 2. The Senate Finance Committee further concluded that "[i]n both instances, Credit Suisse failed to disclose the accounts to DOJ after entering into its plea agreement, and only did so after whistleblowers notified U.S. authorities of the existence of the accounts." Report at 2.

But Credit Suisse's misconduct did not stop there, during the Senate Finance Committee investigation, "Credit Suisse disclosed to the Committee that in connection with its ongoing cooperation with DOJ it had identified 10 additional large client relationships involving U.S. persons, with each client holding in excess of $20 million. Days prior to the release of this report, Credit Suisse also disclosed that review in response to the Committee's investigation identified another 13 large accounts in excess of $20 million that may be held by U.S. persons." Report at 2.

Finally, the Senate Finance Committee determined that it was "deeply

8

concerning that almost nine years after executives testified before Congress that the bank would clean up its act, Credit Suisse is still disclosing hundreds of millions of dollars in secret offshore accounts belonging to wealthy U.S. taxpayers." Report at 2.

Despite swearing in 2014 it was "going to be completely compliant going forward," Credit Suisse has not made good on that promise, and DOJ has not punished Credit Suisse for blatantly violating its plea agreement and continuing to help wealthy Americans hide their money offshore. The Senate found concerning that "nine years after Credit Suisse's plea agreement, the bank continues to identify potential undeclared accounts, and DOJ has yet to impose additional penalties. This fact indicates a lapse in oversight by DOJ…" Report at 23.

Relator brought this action to hold Credit Suisse responsible for defrauding the United States out of approximately $1.3 billion.

## ARGUMENT

I. **The District Court Violated the FCA By Not Holding an In-Person Hearing.**

### a. The FCA requires an in-person hearing.

Both the text, structure, and the Government's "uncommon, even extraordinary power" (*United States ex rel. Polansky*, 599 U.S. 419, 430 (2023)) to dismiss an action over the objection of the person bringing the case compel the conclusion that the "hearing" required by the FCA means an in-person hearing.

9

Two important features of the *qui tam* action compel this conclusion. A relator has a property right in a *qui tam* action, and the FCA gives the "relator himself an interest *in the lawsuit*, and not merely the right to retain a fee out of the recovery." *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000) (emphasis in original). This legal interest in the suit is the type of constitutionally recognized property right protected by due process. *Tulsa Prof'l Collection Servs. v. Pope*, 485 U.S. 478, 485 (1998). The Government should be unable to extinguish a property right without at least a modicum of due process. A *qui tam* relator who has put time, effort, and funds into an action should at least be given the same protection that welfare beneficiaries receive before the Government can terminate their welfare benefits. *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970) (finding that welfare beneficiaries are entitled to an in-person hearing before Government can terminate their benefits).

Legislative history reflects that Congress intended for the relator to "act[] as a check that the Government does not neglect evidence, cause undu[e] delay, or drop the false claims case without a legitimate reason." S. Rep. 99-345, at 26, (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5267. An in-person hearing, rather than a written submission "affords a measure of public accountability" and ensures that the Government is not using its extraordinary dismissal powers arbitrarily or illegitimately. *United States ex rel. Health Choice Alliance v. Eli Lily & Co.*, 4 F.4th

255, 264 (5th Cir. 2021).

Relying on two lines of cases—those interpreting FCA Section 3730(e)(4)(A) and those interpreting Federal Rules of Civil Procedure 12 and 56—the Government contends that the "hearing" contemplated by Section 3730(c)(2)(A) can be satisfied by written submissions alone. Government's Brief, DE 41 ("Gov Br.") at 19, 20, 25. But the cases the Government points to are distinguishable.

In the first line of cases, courts were tasked with interpreting the term "hearing" in a different section of the FCA. Section 3730(e)(4)(A)(i) bars *qui tam* claims "if substantially the same allegations as alleged in the [qui tam] action or claim were publicly disclosed[] … in a federal criminal, civil, or administrative hearing in which the Government or its agent is a party." *See, e.g.*, *United States ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1350 (4th Cir. 1994). Those cases analyzed whether "information disclosed through civil litigation and on file with the clerk's office should be considered a public disclosure of allegations in a civil hearing" for purposes of the public disclosure bar to bringing a *qui tam* case. In analyzing that question, this Court noted that there was considerable "fluidity in the meaning of the term 'hearing'" and that the term hearing "**in its legal context undoubtedly has a host of meanings that will vary depending on the context**." *Id.* at 1350 (emphasis added and quotation omitted). For purposes of the public disclosure bar rule, the Court found that hearing meant an "entire civil proceeding."

*Id.*

The Government points to a second line of cases holding that the "hearing" requirements of Federal Rules of Civil Procedure 12 and 56 mean only written submissions and not oral hearings. Gov. Br. 20-21, 25.

Both lines of cases relied upon by the Government differ from the present situation in two significant ways. First, in neither of those cases was the Government exercising an extraordinary and uncommon power of terminating a property right, and thus due process concerns were not implicated. Further, neither of those cases presents a situation where an individual is tasked with holding the Government accountable and ensuring it does not exercise its non-enforcement discretion arbitrarily or improperly.

In short, the unique role of a relator in the FCA's scheme suggests that when the Government exercises its extraordinary power to dismiss a suit over the objection of the individual who initiated the case, at a minimum, the relator should be provided an in-person hearing—either oral argument or an evidentiary hearing.

**b. In-person hearings are, at the very least, required when a relator shows that the Government's dismissal is motivated by illegitimate reasons.**

Even if an in-person hearing is not required in every circumstance when the Government dismisses a *qui tam* suit over objection of a relator, a hearing is required where the relator raises the specter, as the relator did here, that the Government's

dismissal is based on "illegitimate reasons." *Heckler v. Chaney*, 470 U.S. 821, 839 (1985) (Brennan, J., concurring).

Under *Polansky*, a court must analyze whether the Government may dismiss a *qui tam* action over the relator's objection. *Polansky*, 599 U.S. 436-437. If the dismissal occurs pre-answer, the Court must determine whether dismissal violates "bedrock constitutional constraints on Government action." *Polansky*, 599 U.S. at 436 n.4. If the dismissal occurs post-answer, the Court must determine whether dismissal is "proper" considering the relator's interests. *Id.* at 437.

Where, as here, the case is dismissed pre-answer, a hearing must be allowed when a relator makes a colorable showing that dismissal violates certain constitutional constraints on the Government's non-enforcement powers. The Senate Judiciary Committee Report on FCA amendments passed in 1986 states: "[E]videntiary hearings should be granted when the *qui tam* relator shows a 'substantial and particularized need' for a hearing. Such a showing could be made if the relator presents a colorable claim that the settlement or dismissal is unreasonable in light of existing evidence, that the Government has not fully investigated the allegations, or that the Government's  decision was based on arbitrary and improper considerations." Rep. 99-345, at 26 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5267.

Contrary to the Government's assertion (Gov. Br. 17), Relator has indeed

made a preliminary showing that dismissal would violate "bedrock constitutional constraints on Government action." *Polansky*, 599 U.S. at 436 n.4. Thus, he is entitled to a hearing.

In explaining that pre-answer the Government's dismissal cannot violate certain constitutional constraints, the Supreme Court cited to the Third Circuit which cited to the Seventh Circuit case *United States ex rel. CIMZNHCA, LLC v. UCB, Inc.*, 970 F.3d 835, 845 (7th Cir. 2020). That court noted that there are constitutional limits on the Government's non-enforcement power, especially when the Government is exercising its coercive power to extinguish a property right. That court's citation to the Supreme Court's *Yick Wo v. Hopkins* suggests the limits of executive nonenforcement decisions:

> [E]nforcing these notices may ... bring ruin to ... those against whom they are directed, while others, from whom they are withheld, may be actually benefited by what is thus done to their neighbors; and, when we remember that this action of non-action may proceed from enmity or prejudice, from partisan zeal or animosity, from favoritism and other improper influences ..., it becomes unnecessary to suggest ... the injustice capable of being wrought.

*CIMZNHCA*, 970 F.3d 835, 851 (7th Cir. 2020) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886)).

In other words, a relator can make a preliminary showing that the Government's nonenforcement decision violates the constitution by pointing to a wide variety of inappropriate reasons for nonenforcement such as "partisan zeal" or

animosity or bribes or, as in this case, a desire to conceal executive misconduct and prosecutorial negligence. *Id.*

A recent Senate Report has bolstered Relator's allegation that dismissal of this case was motivated, at least in part, by the Government's desire to insulate DOJ from scrutiny about inadequate oversight of Credit Suisse:

> In November 2014, Credit Suisse was sentenced … and at the time the Horsky account was still not identified by Credit Suisse or the U.S. government … Despite the failure of Credit Suisse to disclose Horsky's account for nearly a year after pleading guilty to conspiracy to aid and assist U.S. taxpayers in filing false tax returns, ***DOJ appears to have taken no punitive action against Credit Suisse***. After Horsky pleaded guilty, the [Relator] continued to provide additional information to IRS and DOJ about Credit Suisse practices in 2016 and 2017, even arranging for additional witnesses to provide information. ***DOJ still took no action***. As discussed below, now, ***nine years after Credit Suisse's plea agreement, the bank continues to identify potential undeclared accounts, and DOJ has yet to impose additional penalties***. ***This fact indicates a lapse in oversight by DOJ*** …

Report at 23 (emphasis added).

In sum, the district court should have granted the Relator's request for an evidentiary hearing because the Relator presented "some evidence that the Government's decision to dismiss was unreasonable … or based on arbitrary and improper considerations." *United States v. Academy Mortg. Corp.*, 2018 WL 1947760, at *4 (N.D. Cal. Apr. 25, 2018); *See Ridenour v. Kaiser-Hill Co.*, 397 F.3d 925, 936 (10th Cir. 2005) (conducting five-day evidentiary hearing to probe the Government's reasons for dismissal); *United States ex rel. Stovall v. Webster*, 2018

15

WL 8701241, at *2 (D.S.C. May 30, 2018) (allowing evidentiary hearing in which relator called witnesses from the Department of Veterans Affairs).

A hearing would serve an important purpose here, ensuring that the Government is not dropping this case for improper and illegitimate reasons. Instead of substantively defending DOJ, the Government has offered up—both at the district court and here—the same unsatisfying quip that the Government "vigorously dispute[s] the Relator's accusations of misconduct" but it cannot offer a substantive defense "because refuting those accusations would infringe on privileged information related to prosecutorial decision-making and protected and inadmissible plea negotiations." Gov. Br. at 29. Rather than helping the Government, this Government doublespeak makes a hearing all the more necessary.

An evidentiary hearing to address Relator's argument that the Government's dismissal was improper would have allowed the district court to evaluate the credibility of the evidence presented by both the Relator and the Government and determine whether the Government was dismissing this case to shield DOJ from an interrogation into DOJ's troubling "lapse in oversight." An evidentiary hearing would not have required DOJ to expend significant resources and would not have interfered with ongoing discussions with Credit Suisse regarding the identification and remediation of remaining Credit Suisse accounts held by U.S. citizens.

16

## II.    Plaintiff Stated a Cognizable FCA Claim.

Because this Court should remand the case to the district court for a hearing, this Court need not address the cognizability of Relator's FCA claim. *See United States v. Gonzalez*, 520 U.S. 1, 11 (1997) ("We are hesitant to reach beyond the facts of this case to decide a question that is not squarely presented for our review."). That determination is for the district court to make in the first instance after holding a hearing. If this Court is inclined to reach the issue, however, the district court erred by holding, after only a single paragraph of analysis, that Relator failed to allege a cognizable FCA claim.

Credit Suisse devotes substantially its entire brief to arguing that Relator fails to present a plausible FCA claim. Credit Suisse's Brief, DE 42 ("CS Br.") at 22-47. Credit Suisse too narrowly construes the FCA and fails to recognize that Relator has pled a cognizable FCA claim under at least two theories—fraud-in-the-inducement and breach of a government contract.

### a.  The False Claims Act

"The False Claims Act is intended to reach all types of fraud, without qualification, that might result in financial loss to the Government. The [Supreme] Court has **consistently refused to accept a rigid, restrictive reading.**" *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 788 (4th Cir. 1999) (emphasis added and citation omitted); *Cook Cty. v. United States ex rel. Chandler*, 538 U.S.

119, 129 (2003) (The FCA was drafted "expansively … to reach all types of fraud without qualification, that might result in financial loss to the Government."). In other words, the False Claims Act is to be broadly construed to reach any attempt to defraud the Government of its lawful funds.

### b. Fraud-in-the-Inducement Theory

Credit Suisse spends dozens of pages criticizing Relator's reverse false claim theory without recognizing that Relator's complaint also states an FCA claim under a fraud-in-the-inducement theory, a theory distinct from a reverse false claim.[6]

A defendant may be liable under the FCA if the contract under which payment is made to the Government or money is forfeited by the Government was procured through fraud. *United States ex rel. Longhi v. Lithium Power*, 575 F.3d 458, 467-68 (5th Cir. 2009). A fraudulent inducement claim is "concerned with whether the contract or extension of a government benefit was obtained originally through false statements or fraudulent conduct … materiality depends on whether it could have influenced the government's decision to [enter into the contract in the first place.]" *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 378 (4th Cir. 2008). In order to prove a fraudulent inducement claim, a plaintiff must show that: "(1) there was a false statement or fraudulent course of conduct; (2) made or

---

[6] To the extent this Court finds the fraud-in-the-inducement theory is not adequately alleged, Relator would move for leave to amend should the case be remanded.

carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money *or to forfeit moneys due* (i.e., that involved a 'claim.')." *Id.* at 376 (emphasis added).

The Relator's complaint plausibly alleges a fraudulent inducement claim. A Rule 11(c)(1)(C) plea agreement is a contract and is binding on a district court once accepted. *United States of America v. Fields*, 763 F.3d 443, 455 (6th Cir. 2014). Credit Suisse induced the district court to accept the binding plea agreement based on lies. Mr. Reifenberg, under oath, stood before Judge Smith and swore up and down that the statement of facts was complete and truthful. That statement of facts precariously rested atop a mountain of lies: Credit Suisse did not end its conspiracy in 2009 (JA 79); it did not stop opening new U.S. client accounts for U.S. residents in 2009 (JA 89); and it did not require existing clients to become U.S. tax compliant (JA 89). Had Judge Smith known about these egregious and fundamental lies, the Court would not have "forfeited" the $2.6 billion owed to the public fisc. It would not have allowed Credit Suisse to pay the lowest fine allowed ($1.3 billion) under the guidelines and likely would have sentenced Credit Suisse to a much higher criminal fine.

In short, the Relator has alleged a cognizable FCA claim under a fraud-in-the-inducement theory.

### c. Reverse False Claims Theory

Credit Suisse argues that Relator has failed to allege an "obligation" which would give rise to a reverse false claim. CS Br. at 22-38. Credit Suisse ignores that it has a contractual relationship with the Government, that it breached its contract with the Government in a fundamental and material way, and that the remedy for that breach, under a reasonable reading of the contract, is that Credit Suisse owes up to an additional $1.3 billion.

The FCA's reverse false claims provision makes liable any company who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases and obligation to pay or transmit money or property to the Government." FCA Section 3729 (a)(1)(G). Conduct prohibited by this section of the FCA is known as a "reverse false claim" because the action of the defendant results not in improper payment to the defendant from the Government, but rather no payment to the Government when payment is otherwise obligated.

Under recent amendments to the FCA, a defendant is liable under a reverse false claim theory under two different standards—a higher standard which requires that the relator prove that a defendant used a false statement to avoid or improperly decrease an obligation, and a lower standard that merely requires a relator to show

20

that the defendant knowingly and improperly avoided or decreased an obligation. *United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 255 (3d Cir. 2016) ("A false statement is no longer a required element, since the post-FERA FCA specifies that mere knowledge and avoidance of an obligation is sufficient, without submission of a false record, to give rise to liability.").

"Courts have struggled to define when exactly defendants have an obligation to pay funds to the Government." *U.S. ex rel. Boise v. Cephalon, Inc.*, 2015 WL 4461793, at *3 (E.D. Pa. July 21, 2015) (citation omitted). But there is "broad agreement that a breach of contract can give rise to an 'obligation' under the Reverse False Claims Act." *Ruscher v. Omnicare Inc.*, 2014 WL 4388726, at *5 (S.D. Tex. Sept. 5, 2014).

When stipulated penalties are contained in a contract with the United States, those stipulated penalties are obligations under the FCA even if a governmental body retains some discretion regarding whether to impose the penalties. *Cephalon*, 2015 WL 4461793, at *1; *Ruscher*, 2014 WL 4388726, at *1. In *Ruscher*, the defendant entered into a Corporate Integrity Agreement ("CIA") with the United States, under which it agreed to report any violations of federal healthcare law and certify, on an annual basis, that it was in compliance with the agreement. *Id.* The CIA noted that defendant's breach "may lead to the imposition of" monetary penalties, including a $5,000 fine for false certifications and additional penalties for other violations. *Id.*

21

at *2.

Relator brought a reverse false claims case against the defendant, contending that defendant breached the CIA by failing to notify the government of its illegal activities and other probable violations of applicable laws. *Id.* at *4. Further, relator argued that by falsely representing to the government that it *was* in compliance with the CIA, defendant avoided the stipulated penalties that it would have otherwise faced for breaching the contract. *Id.* Defendant, on the other hand, argued that even if it breached the CIA, it had no "obligation" to pay any fines until the government took further action to liquidate the fine. *Id.* at *5. The district court held that the defendant had an "obligation" to pay a fine even if some further government action was necessary to collect and determine the value of the fine. *Id.* at *5. Ultimately, the Court found that "obligations arising out of a contract were different from [purely] statutory fines and penalties," and the contract [*i.e.* the CIA] makes a difference, providing the "obligation necessary for a Reverse False Claims Act claim." *Id.* at *6.

The CIA in *Ruscher* resembles the Credit Suisse plea agreement. The breach of that plea agreement forms the basis for a reverse false claim against Credit Suisse. A plea agreement is a contract, *Fields*, 763 F.3d 443, and a reasonable interpretation of that contract is that should Credit Suisse breach the contract, it could owe up to $2.6 billion, the maximum criminal penalty contemplated by the contract. JA 62

("[T]he Guidelines Fine Range is $1,333,000,000 to $2,666,000,000."). Under the agreement, among other obligations, Credit Suisse promised to: (1) "promptly disclose" all information related to its servicing of offshore accounts connected to U.S. persons; (2) close certain accounts of U.S. persons; (3) "implement procedures to prevent its employees" from aiding U.S. persons with further concealing funds from the U.S.; and (4) not open any other U.S. related accounts going forward. JA 64-65. Under the contract, if Credit Suisse "fail[s] to perform a material obligation," the United States may pursue additional prosecution and additional penalties. JA 68. Credit Suisse has violated nearly all of its obligations under the agreement. Thus, now the Government can collect the additional $1.3 billion Credit Suisse owes. "[T]he fact that some discretion is involved in" the decision to collect the additional $1.3 billion owed "does not preclude False Claims Act liability." *Ruscher*, 2014 WL 4388726, at *1.

Because the Relator has alleged a reverse false claim based on the theory that the guideline range in the plea agreement is a stipulated penalty range for breach of contract, the district court erred by finding that Relator's complaint failed to state an FCA claim.

### d. Public policy supports finding a cognizable FCA claim.

Credit Suisse contends that allowing this case to proceed would lead to unworkable results and constitutional problems. CS Br. at 38-46. Not so. In fact, this

is the exact type of case that should give rise to an FCA claim. If anything, this case has shown what happens when DOJ refuses to admit that its oversight of a corporate recidivist was inadequate. Not wanting to admit its "lapse in oversight," the Government dismissed this case in an attempt to shield DOJ from scrutiny about its failures to ensure Credit Suisse was abiding by the plea agreement. The consequence of that decision is that Credit Suisse has, for years, continued to assist U.S. taxpayers with hiding their wealth from the IRS. Relators should be allowed, through the FCA, to hold corporate recidivists accountable in circumstances, like this one, where DOJ refuses to act.

Further, Credit Suisse's hyperbolic contention—that an FCA case based on the breach of a criminal plea agreement would be unworkable because it would require a factfinder to "second guess" Judge Smith—fails. CS Br. at 40-42. There is nothing unique or improper about a "collateral attack" on a criminal sentence. Collateral challenges to criminal convictions happen all the time when courts entertain *habeas* cases, for example, to determine whether criminal convictions or sentences were properly issued. *United States v. Mikalajunas*, 186 F.3d 490, 492–93 (4th Cir. 1999). Courts have also found that FCA cases are not somehow unworkable merely because a factfinder has to determine whether and how much of a fine a governmental body would have levied had defendant been truthful. *See Ruscher*, 2014 WL 4388726, at *5 (denying motion to dismiss an FCA case even

though factfinder would need to determine value of monetary penalties U.S. Office of Inspector General would have levied against defendant for breaching its corporate integrity agreement).

## III. Credit Suisse's Alternative Arguments for Dismissal Should Be Rejected.

Credit Suisse urges two alternative arguments for dismissal not raised below: (1) Credit Suisse contends that Relator has not identified a false statement that gives rise to an FCA claim; and (2) Credit Suisse argues that the case is barred by applicable statute of limitations. CS Br. at 47-55.

The Court can dispense with these arguments without reaching their merits because they were never addressed in the proceedings below. *Holly Hill Farm Corp. v. United States*, 447 F.3d 258, 268 (4th Cir. 2006) (refusing to consider "issues raised for the first time on appeal.").

Even if the Court were to reach these issues, Relator has identified numerous false statements in the statement of facts, which was used to induce Judge Smith to accept a low-guideline sentence. *See* above at 4-7. To argue otherwise, especially in the face of the Senate's recent findings, is nonsense.

Credit Suisse's statute of limitation argument fares no better. First, statute of limitation defenses can be waived. *Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 654 (4th Cir. 2006). In its plea agreement, Credit Suisse agreed that "in any such prosecution" related to a breach of the plea agreement, it was "waiv[ing] any statute-

of-limitations defense." JA 70. That waiver applies to this FCA case based on the breach of the plea agreement.

Further, under the governing statute, an FCA claim is timely if brought "three years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances." FCA Section 3731(b)(2).

Here, there is a fact question about when DOJ was aware or should have been aware of the facts material to determine that Credit Suisse had defrauded Judge Smith and breached its plea agreement. That fact issue alone defeats Credit Suisse's statute of limitations defense. *United States v. BNP Paribas SA*, 884 F. Supp. 2d 589, 598 (S.D. Tex. 2012) ("Although the court concludes that the United States' FCA claims do not fall squarely within the FCA's six-year limitation period, the court also concludes that these claims are not subject to dismissal because whether they are subject to the FCA's three-year tolling provision is a question of fact that cannot be resolved on the pleadings alone.").

## CONCLUSION

For the reasons stated above, Relator respectfully requests that this Court remand the case and order the district court to hold a hearing. To date, the Government has yet to hold Credit Suisse accountable for a decade-long, continued conspiracy to defraud the United States that occurred after Credit Suisse pled guilty

to helping Americans conceal billions of dollars from the IRS.  This lawsuit seeks

to recover the $1.3 billion Credit Suisse effectively stole from the United States.

Respectfully submitted,
/s/Jeffrey A. Neiman
**Jeffrey A. Neiman**
Florida Bar No. 544469
Attorney for Plaintiff-Appellant
Marcus Neiman Rashbaum & Pineiro LLP
100 Southeast Third Avenue, Suite 805
Fort Lauderdale, FL 33394
Tel: (954) 462-1200
jneiman@mnrlawfirm.com

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7)(c), I hereby certify the foregoing brief complies with the type-volume limitation in Fed. R. App. P. 32(a)(7)(B), the typeface requirements of Fed. R. App. 32(a)(5), and the type style requirements of Fed. R. App. P. 32(a)(6). The word processing program used to prepare the brief reports that the brief is 6,333 words long. The brief has been prepared in a proportionally spaced typeface using Microsoft Word with Times New Roman, 14 point font.

Respectfully submitted,

/s/ Jeffrey A. Neiman

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 11th day of December, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

Respectfully submitted,

/s/ Jeffrey A. Neiman